UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Courtney Thomas and Jeffrey Nichols, | ) ) ) |
| Plaintiffs, | ) No. 11 C 09275 ) |
| v. | ) ) ) Judge Edmond E. Chang |
| City of Chicago, IPRA Investigators James Lukas, Kristi Lyons, Jeanne Goodwin, and Michael Duffy, et al., | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Courtney Thomas and Jeffrey Nichols bring this lawsuit against multiple Chicago Police Department (CPD) officers and detectives (in their individual capacities) and the City of Chicago, alleging civil rights violations pursuant to 42 U.S.C. § 1983.[1] Also named as defendants are four Independent Police Review Authority (IPRA) investigators: James Lukas, Kristi Lyons, Jeanne Goodwin, and Michael Duffy (collectively, the IPRA Defendants). In their complaint, Thomas and Nichols allege that two Chicago police officers, Jason Landrum and John Kennedy, shot Thomas and illegally detained Nichols and their property following a roadside stop of their car. R. 54, Am. Compl. They also allege that other Chicago police officers and the IPRA Defendants conspired to cover up the incident during the ensuing investigation. *Id.* at 17-18. Finally, they bring a claim against the City of Chicago, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for maintaining policies, customs,

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

and practices that enabled the cover-up. *Id.* at 18-20. The IPRA Defendants have moved to dismiss all claims against them pursuant to Federal Rule of Procedure 12(b)(6) [R. 56]. For the reasons that follow, the motion is granted.

## I. Background

In evaluating this motion to dismiss, the Court accepts as true the complaint's factual allegations and draws reasonable inferences in Plaintiffs' favor. *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S. Ct. 2074, 2079 (2011). On January 1, 2010, Nichols and Thomas drove to Chicago from Michigan to run errands and look at used cars. Am. Compl. ¶¶ 8-9. At around 11:30 a.m., Officers Landrum and Kennedy pulled Nichols's car over on East 75th Street near Prairie Avenue and State Street. *Id.* ¶¶ 14, 17-19. Landrum and Kennedy approached the car, opened the driver and passenger doors, and commanded Nichols and Thomas to get out. *Id.* ¶¶ 21-22. The officers did not tell them why they had been pulled over, why they were being asked to get out of the car, or that they were under arrest. *Id.* ¶ 23. Instead, Kennedy began putting his hands on Thomas. *Id.* ¶ 24.

At this point, the encounter turned violent. After Officer Kennedy put his hands on Thomas, Officer Landrum yelled at Thomas, "What is your problem?" *Id.* ¶ 25. Landrum then grabbed and hit Thomas, put him in a headlock, and threw him to the ground. *Id.* ¶¶ 26-27. Landrum then shouted to Kennedy that Thomas was going for Landrum's gun—which was holstered and secured—and that Kennedy should "shoot the motherfucker." *Id.* ¶¶ 28, 31, 32. Instead of shooting Thomas at that point, Landrum and Kennedy brought him over to a storefront's metal security gate and

handcuffed his left arm to the gate. *Id.* ¶¶ 34-35. Even though Thomas was secured to the gate and was at no time a threat to the safety of either officer, Landrum told Kennedy, "Well, if you won't shoot him, I will." *Id.* ¶¶ 36-37. Kennedy was shocked and jumped out of the way, and then Landrum took a step back, pulled out his gun, and shot Thomas in the stomach. *Id.* ¶¶ 38-39.

Meanwhile, Nichols had been taken out of his car and left sitting on the curb, handcuffed, in the cold without his coat. *Id.* ¶¶ 51-53. Landrum refused Nichols's requests for his coat, and instead forcibly pinched his shoulder and neck painfully. *Id.* ¶ 53. Then Nichols, despite being told that he was "just a witness," was placed in a paddy wagon and kept there for an extended period of time until he was driven to the police station. *Id.* ¶¶ 54-56. At the station, he was handcuffed to a wall for over seven hours. *Id.* ¶¶ 57, 59. Nichols was kept there even though he complained that the handcuffing was hurting him because of a previous back injury. *Id.* ¶ 58. Because he was not let out to use the bathroom, he had to urinate into a wastebasket. *Id.* ¶ 60. Nichols was then questioned and interrogated, held for another ten hours, and then released well after midnight. *Id.* ¶¶ 61-63. Without his car and coat—which had been seized by the police—Nichols had to stay in a 7-11 convenience store and a hotel until he could catch a train home. *Id.* ¶¶ 65-66.

Thomas was hospitalized after the shooting. *Id.* ¶ 70. After multiple surgeries (that could not save parts of his stomach and intestines), he was incarcerated in Cook County Jail until September 2011 when he entered a no-contest plea to unlawful possession of a firearm and resisting arrest. *Id.* ¶¶ 42, 70.

3

Following these events, Thomas and Nichols filed a five-count complaint. In Count One, they allege that Landrum and Kennedy used excessive force against Thomas. *Id.* at 13-14. In Count Two, they allege that all Defendants (including the IPRA Defendants) unlawfully seized their persons and property in violation of the Fourth and Fourteenth Amendments.[2] *Id.* at 15-16. Similarly, in Count Three, they allege that the seizure of Nichols and Thomas's property—Nichols's 1999 Silver Chrysler Concord and $3,462 of Thomas's cash—was an unconstitutional taking and a due process violation. *Id.* at 16-17. In Count Four, they allege that all Defendants conspired to cover up the excessive force used against Thomas by falsifying reports and creating inconsistencies in the witness statements of the civilians on the street during the morning of the shooting. *Id.* at 17-18. Finally, in Count Five, they allege that the City of Chicago had a policy and practice to detain witnesses, seize personal property, and allow police officers and IPRA investigators to cover up police misconduct. *Id.* at 18-20. The IPRA Defendants move to dismiss all claims against them.

---

[2]To be sure, the Amended Complaint does not clearly assert an unlawful seizure claim as to Thomas himself. *Compare* Am. Compl. ¶ 108 (alleging that Nichols *and* his car have been seized), *with id.* ¶ 109 (alleging *only* that Thomas's money was seized). But Plaintiffs' response brief does assert a theory of liability for the IPRA Defendants as to Thomas. R. 67, Pl.'s Resp. Br. at 4. Moreover, the IPRA Defendants do not argue in their reply brief that the Amended Complaint only asserts a claim for the unlawful seizure of Nichols (which would not make a lot of sense). To cover all bases, the Court will charitably construe the Amended Complaint as alleging the unlawful seizure of both Thomas and Nichols themselves in addition to their property.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Significantly, the only allegations that are entitled to the assumption of truth are those that are *factual* allegations, rather than mere legal conclusions or formulaic assertions of elements of the asserted claim. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

The IPRA Defendants move to dismiss Counts Two, Three, and Four of the Amended Complaint. For the reasons below, the Court dismisses each count.

### A. Count Two (Unreasonable Seizure)

Under *Alejo v. Heller*, "[a] plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions." 328 F.3d 930, 936 (7th Cir. 2003) (citation omitted). Accordingly, the IPRA Defendants contend that they did not personally participate in or cause the seizure of Thomas, Nichols, or their property; they were not even at the scene when Thomas was shot and Nichols was detained. R. 57, Defs.' Br. at 5. Thomas and Nichols respond with a but-for theory of liability: if the IPRA Defendants had not falsified eyewitness reports, reviewing police Sergeants or Assistant State's Attorneys may have released Thomas and Nichols earlier. R. 67, Pls.' Resp. at 4. So according to Plaintiffs' theory, even if the IPRA Defendants did not actually seize them, the IPRA Defendants are liable for unconstitutionally *prolonging* their seizure.

The problem with this theory is that it is not plausibly alleged in the Amended Complaint. True, it pleads that the IPRA Defendants manipulated statements from eyewitnesses (Jacqueline House, Ozell Champagne, Antonio Champagne, and Robin Gibbs) and from Nichols himself. Am. Compl. ¶¶ 79, 85-91. It even alleges that all Defendants engaged in a "roundtable" to suppress and falsify evidence. *Id.* at ¶ 92. But the Amended Complaint does not adequately describe the causal link that Thomas and Nichols rely upon: it pleads no facts linking the allegedly falsified IPRA reports to any

6

CPD seizure decision. Indeed, it does not allege that anyone in charge of deciding how long to seize Thomas, Nichols, or their property—a police Sergeant or reviewing Assistant State's Attorney—even *saw* an IPRA investigative report, let alone *relied* on those reports as justification to seize them longer. Lacking this factual detail, all that Plaintiffs can rely upon is conjecture and speculation. *See* Pls.' Resp. at 4 ("If . . . the IPRA investigators ha[d] properly and accurately reported their accounts, the reviewing Sergeants *may very well have* decided to release Thomas. Or, the reviewing Felony Review Assistant State[']s Attorney *may have suggested* that they release him." (emphases added)).

Thomas and Nichols's theory of liability is especially implausible without these facts in light of IPRA's function as the "*independent* police review authority." City of Chicago Ordinance § 2-57-020 (emphasis added). Chicago created IPRA in 2007 by removing the former Office of Professional Standards from the CPD and reorganizing the internal-affairs function as a separate department reporting directly to the Mayor of Chicago. *Obrycka v. City of Chicago*, 2012 WL 601810, at *3 n.2 (N.D. Ill. Feb. 23, 2012); *see also* City of Chicago Ordinance § 2-57-020 ("The offices of the independent police review authority shall be located in a facility outside of the department of police."). So IPRA is not part of the official chain of command of either the CPD or the State's Attorney's Office. Nor do Chicago's municipal ordinances contemplate that IPRA investigative reports will be used to assist, even unofficially, the CPD or the State's Attorney's Office in their own criminal investigations. *See* City of Chicago Ordinance § 2-57-040(f) (empowering IPRA to "forward all other complaints filed

7

against members of the department to the department's internal affairs division"). Instead, IPRA recommendations of officer discipline are to be considered by the CPD administration directly, and not rank-and-file CPD officers. *See id.* § 2-57-060. IPRA's independent role and function thus cuts further against Thomas and Nichols's theory that CPD decisionmakers relied on falsified IPRA reports—rather than on reports generated by actual CPD officers investigating the shooting itself—to prolong the seizure of Plaintiffs and their property.

Ultimately, the allegations in the Amended Complaint, as they stand now, are too implausible to put the IPRA Defendants on notice of how exactly they are liable for unconstitutionally seizing Plaintiffs or their property. *Brooks*, 578 F.3d at 582; *see also McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011) ("[Plaintiff] needed to allege enough 'by way of factual content to nudg[e] his claim . . . across the line from conceivable to plausible.'" (quoting *Iqbal*, 556 U.S. at 680) (internal quotation marks omitted)). But if Thomas and Nichols—after continuing to take discovery from both the CPD Defendants and the IPRA Defendants, as the Court instructed them to do at the February 27, 2013 status hearing—actually uncover facts plausibly suggesting that the IPRA reports prolonged their detention, they are free to move to amend their complaint accordingly. The Court notes that the Fourth Amendment (via incorporation through the Fourteenth Amendment) governs the period of confinement between the arrest and the preliminary hearing at which a determination of probable cause is made, *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) (citations omitted), and arrestees must generally receive that hearing within 48 hours of arrest. *Cnty. of Riverside v.*

8

*McLaughlin*, 500 U.S. 44, 56-57 (1991). So any amended complaint ought to allege, at a minimum, that any reviewing CPD officer or prosecutor considered the IPRA investigative reports within that narrow 48-hour window after Thomas and Nichols's detention. Such facts may be hard to come by, but Plaintiffs are welcome to try (but beware the shifting of costs under Rule 54(d)(1)). In the meantime, the unreasonable seizure claim (Count Two) is dismissed without prejudice as to the IPRA Defendants.

### B. Count Three (Takings and Due Process)

Thomas and Nichols agree that Count Three, the unconstitutional takings and the due process claim, does not state a claim against the IPRA Defendants upon which relief may be granted. Pls.' Resp. at 7. Given that concession, Count Three is dismissed with prejudice as to the IPRA Defendants.

### C. Count Four (Conspiracy)

In Count Four, Thomas and Nichols allege that all Defendants (including the IPRA Defendants) conspired with each other to cover up the shooting of Thomas, the illegal seizure of Nichols, and the illegal seizure of their property. Am. Compl. at 17-18. To establish § 1983 conspiracy liability against the IPRA Defendants, Thomas and Nichols must plead that (1) the IPRA Defendants and the CPD Defendants reached an understanding to deprive them of their constitutional rights, and (2) all Defendants were willful participants in joint activity. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (citation omitted). But if the underlying act does not itself violate the Constitution, there can be no constitutional violation for any attempt to cover up the act. *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) ("The jury's

9

conclusion that [the plaintiffs] suffered no constitutional injury thus forecloses relief on the conspiracy claim." (citations omitted)); *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996) ("[T]here is no constitutional violation in conspiring to cover up an action which does not itself violate the [C]onstitution." (citation omitted)). And as discussed, Thomas and Nichols do not plausibly plead that the IPRA Defendants unconstitutionally seized them or their property. So the conspiracy claim (Count Four) is also dismissed without prejudice as to the IPRA Defendants.

## IV. Conclusion

For the reasons stated above, the IPRA Defendants' motion to dismiss [R. 56] is granted.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 29, 2013

10